UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>For Online Publication Only</u>

------------------------------------------------------------------X

RUTH YOVEL-BASH, ELI BASH, YAEL BASH,
and AMIR BASH,

                    Plaintiffs,

                  -against-

WELLESLEY ASSET SECURED PORTFOLIO,
Inc., f/k/a/ THE PAN AMERICAN FUND, LLC,
f/k/a/ ATLAS INVESTMENT TRUST, INC., DALE
WOOD, THOMAS MAYER, and PETER M.
BURGESS,

                    Defendants.

------------------------------------------------------------------X

**<u>MEMORANDUM AND
ORDER</u>**

12–CV–5280 (JMA)

A P P E A R A N C E S :

Jeffrey Benjamin, Esq.
Law Office of Jeffrey Benjamin
104–08 Roosevelt Ave., Fl. 2
Corona, NY 11368
      *Attorney for Plaintiffs*

Michael Harold Maizes, Esq.
2027 Williamsbridge Rd.
Bronx, NY 10461
      *Attorney for Defendants Wellesley Asset Secured Portfolio, Inc., f/k/a The Pan American
      Fund, LLC; Atlas Investment Trust, Inc., Dale Wood, and Peter M. Burgess*

**AZRACK, United States Magistrate Judge:**

      On October 22, 2012, plaintiffs Ruth Yovel-Bash ("Ruth"), Eli Bash ("Eli"), Yael Bash

("Yael"), and Amir Bash ("Amir"; and, collectively with Ruth, Eli, and Yael, "plaintiffs") filed a

complaint (the "Complaint") against defendants Wellesley Asset Secured Portfolio, Inc.

("Wellesley"), f/k/a/ The Pan American Fund, LLC ("Pan American"), f/k/a Atlas Investment

Trust, Inc. ("Atlas"), Dale Wood, Thomas Mayer, and Peter M. Burgess (collectively,

"defendants").  Compl., ECF No. 1.  In the Complaint, plaintiffs allege that defendants (1) violated the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(a)–(d), by soliciting investments with intent to defraud and concealing that they were conducting a Ponzi scheme, id. ¶¶ 27–44; (2) engaged in deceptive trade practices, in violation of N.Y. Gen. Bus. L. § 349, Compl. ¶¶ 45–52; (3) fraudulently induced plaintiffs and other investors to enter into investment agreements by misrepresenting the investments' true nature and concealing that defendants never intended to pay interest, id. ¶¶ 32, 53–59; (4) breached investment agreements with plaintiffs by failing to return Ruth and Yael's principal and failing to make interest payments to all plaintiffs, id. ¶¶ 22–26; (5) secretly downgraded plaintiffs' investments from secured to unsecured, and converted plaintiffs' funds by refusing to return plaintiffs' money, id. ¶¶ 60–65; and (6) were unjustly enriched, id. ¶¶ 70–74.

On April 29, 2013, plaintiffs, as well as Wellesley, Pan American, Wood, and Burgess ("moving defendants") consented to having me conduct all proceedings in this case, including trial, entry of final judgment, and post-trial proceedings.  ECF No. 12.  Mayer so consented on August 20, 2013.  ECF No. 25.

On June 19, 2013, moving defendants moved to dismiss for lack of jurisdiction, improper venue, and failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(2), (3), and (6), respectively, or, in the alternative, to transfer venue to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1404(a).  Defs.' Mot., ECF Nos. 16–19.  Plaintiffs oppose the motion and, on June 20, 2013, cross-moved to amend the Complaint.  Pls.' Cross-Mot., ECF Nos. 17–19. On August 30, 2013 defendant Thomas Mayer joined the motion. See Def. Mayer's Mot. for Joinder, ECF No. 27.

For the reasons discussed below, defendants' motion to dismiss for improper venue is denied, but their alternative motion to transfer venue to the Southern District of Florida is granted.  Accordingly, I do not reach defendants' motion to dismiss for failure to state a claim or plaintiffs' cross-motion to amend the Complaint, which are more properly venued in the Southern District of Florida.

## I.   BACKGROUND

### A.   <u>Plaintiffs' Investments</u>

On or around June 5, 2003, defendant Mayer solicited investment funds from Ruth, who was in New York.  Compl. ¶ 14.[1]  Ruth is a New York resident, as are her husband, Eli; their daughter-in-law, Yael; and their son, Amir.  <u>Id.</u> ¶¶ 7–10.  Mayer represented that his investment enterprise would provide financing to commercial and residential income-producing properties and would support a monthly return of twelve percent yield.  <u>Id.</u> ¶ 14; see also Ruth Aff. ¶¶ 10–11, 13, 18–20; Eli Aff. ¶¶ 2–3; Yael Aff. ¶¶ 2–3; Amir Aff. ¶¶ 2–3 (stating that Wood also made such representations).  At various times thereafter, plaintiffs made investments with "defendants."  <u>Id.</u> ¶¶ 15, 18–19.  Defendants Mayer, Wood, and Burgess are Florida residents, and defendants Wellesley, Atlas, and Pan American are Florida corporations, <u>id.</u> ¶¶ 11, 13.

The parties seem to agree that plaintiffs' investments were originally secured by real property, though they disagree as to which documents evidence such securement.

---

[1]  For purposes of this motion, I deem plaintiffs' allegations in the Complaint true and construe the facts in the light most favorable to plaintiffs.

1.      **Eli's Investments**

        a.      *Eli's Promissory Notes Before 2006*

The following chart describes promissory notes Eli received:

| Date | Maker | Signatory | Amount | Expiration | Securement | Choice of Law Provision |
|------|-------|-----------|--------|------------|------------|-------------------------|
| 6/5/03 | Atlas | Unknown | $100,000 | 7/4/04 | Unknown | Unknown |
| 12/22/03 | Atlas | Unknown | $159,000 | 12/22/04 | Unknown | Unknown |
| 4/8/04 | Atlas | Mayer, as Atlas's president | $159,000 | 4/7/05 | Note by 210 Property Holdings, Inc. | No |
| 12/20/04 | Mabel | Mayer, as Mabel's president | $159,000 | 12/20/05 | Atlas investment note on Florida real estate | No |
| 1/3/08 | Pan American | Wood, as Pan American's Managing Member | $150,000 | 1/3/09 | No | No |
| 3/24/11 | Pan American | Wood, as Pan American's Manager | $150,000 | 2/3/12 | No | Yes |
| 3/1/12 | Pan American | Wood, as Pan American's Manager | $150,000 | 3/31/13 | No | Yes |

In 2003, Eli invested $159,000 through Mayer by sending money from New York to Florida.  Id. ¶¶ 15, 42.  The documents plaintiffs have filed in connection with this motion suggest that on June 5, 2003, Atlas executed and delivered to Eli a promissory note for his investment of $100,000.  Eli's June 5, 2003 Note, Affm. of Jeffrey Benjamin Opp'n Defs.' Mot. ("Benjamin Affm.") Ex. 3 ("Eli's Notes"), ECF No. 18.  Pursuant to this note, Atlas promised to make monthly interest payments at an annual rate of twelve percent until July 4, 2004, at which time the entire principal sum with accrued interest would be due and payable.  Id.  Plaintiffs'

documents also suggest that on approximately December 22, 2003, Atlas executed and delivered to Eli a promissory note for his increased investment of $159,000.  Eli's Dec. 22, 2003 Note, Eli's Notes.[2]  Pursuant to this note, Atlas promised to make monthly interest payments at an annual rate of twelve percent until December 22, 2004, at which time the entire principal sum with accrued interest would be due and payable.  Id.

Before Eli's December 22, 2004 Note expired, Atlas executed and delivered to Eli a similar promissory note.  See Eli's Apr. 8, 2004 Note, Eli's Notes.[3]

Before Eli's April 8, 2004 Note expired, Mabel Investments, LLC ("Mabel"), which shares an address with Atlas but is not a defendant in this case, executed and delivered to Eli a promissory note, which Mayer signed as Mabel's president, for Eli's investment of $159,000.  Eli's Dec. 20, 2004 Note, Eli's Notes.[4]  Pursuant to this note, Mabel promised to make monthly interest payments at an annual rate of ten percent until December 20, 2005.  Id.

At some point, Eli withdrew $9,000, reducing his total investment to $150,000.  Compl. ¶ 17.

All of these promissory notes were drafted and signed in Florida.  See Eli's Notes.  The notes are unilateral, meaning Eli did not sign them.

---

[2]   Moving defendants argue that Eli did not file with the Court the correct signature page from the June 5, 2003 Note.  See Affm. of Michael H. Maizes Opp'n Pls.' Cross-Mot. ("Maizes Affm.") ¶ 14, ECF No. 19.  Eli also fails to provide any signature page for the December 22, 2003 Note.  Moving defendants do not deny that these notes were executed.  However, without complete copies, the Court does not know if the notes (i) are secured or (ii) contain choice-of-law provisions.  In any event, these notes are not relevant for purposes of deciding the instant motion.

[3]   This note was secured by a note dated February 15, 2003, issued "by 210 Property Holdings, Inc. to the Maker for $400,000.00, which [securing note] is governed by . . . the laws of the State of Florida."  Eli's Apr. 8, 2004 Note.

[4]   This note was secured by an Atlas Investment Note on certain real estate in St. Lucie County "currently deeded to Mayer Realty Inc."  Eli's Dec. 20, 2004 Note.

### b.   *The 2006 Confidential Private Offering*

On approximately October 1, 2005, Pan American commenced a confidential private offering of Class A Limited Liability shares ("Units").  Aff. of Dale Wood Supp. Defs.' Mot. ("Wood Aff.") ¶ 3, ECF No. 16; Confidential Private Offering Memorandum ("CPO Memo") at 1, Wood Aff. Ex. A.  Pan American's "Manager" was Contrarian Management Group, LLC ("Contrarian"), a Florida LLC that plaintiffs do not name in the Complaint as a defendant. Contrarian's three sole members were Mayer, Wood, and another individual not a party to this action.  CPO Memo at 11, 19.

The CPO Memo states that Pan American's investment objective will be "[a] diversified mortgage portfolio of secured, high yield first, and/or second, wraparound, commercial, residential and vacant land mortgages and mezzanine equity loans that, generally, will have a shorter term . . . maturity . . . ."  Id. at 11; see also id. at 15.

Defendants assert that all four plaintiffs received the CPO Memo and a package of "Subscription Documents," which included "Subscription Instructions," an investor Subscription Agreement (the "Subscription Agreement"), a signature page to Pan American's LLC Agreement (the "LLC Agreement") for Class A investors (the "LLC Agreement Signature Page"), and an investor questionnaire ("Questionnaire").  See Defs.' Mem. of L. Supp. Defs.' Mot. at 3, ECF No. 16; Subscription Documents, Wood Aff. Ex. B.

Defendants assert that pursuant to these documents, plaintiffs converted investments they had previously made with Mayer into secured Pan American Units.  Wood Aff. ¶ 5.  Defendants also assert that at the time of this conversion, each plaintiff signed a bilateral joint venture agreement (the "JV Agreement") with Pan American.  Id. ¶ 10; JV Agr., Wood Aff. Ex. B.

The Subscription Agreement and JV Agreement contain forum-selection clauses that provide for exclusive jurisdiction in Florida.  See Subscription Agr. Art D(a); JV Agr. Art. 3(e).[5] Additionally, the CPO Memo, which incorporates the LLC Agreement and Subscription Agreement, describes the LLC Agreement as containing a forum-selection clause, though defendants do not provide the Court with a full copy of the LLC Agreement.  See CPO Memo at 7, 22–23, 63–64.[6]  The Subscription Documents, in turn, require the investor to agree to the CPO Memo's terms.  See Subscription Agr. B(b) ("I have received, read, carefully considered and fully understood the [CPO Memo]; Subscription Documents ("NO PERSON MAY RECEIVE

---

[5]  Pursuant to the Subscription Agreement, the investor represents, (1) "I hereby tender . . . two duly executed copies of this Agreement [and] a duly executed (and notarized) copy of [the LLC Agreement Signature Page] . . . ."; and (2) "I have received, read, carefully considered and fully understood the [CPO Memo]."  Subscription Agr. at 1, Art. B(b).  The Subscription Agreement also provides, in an Article titled "Miscellaneous":

> This Agreement shall be governed by and construed in accordance with the laws of the State of Florida applicable to contracts made and wholly performed in that jurisdiction. I hereby consent to the exclusive jurisdiction of the state courts of the State of Florida or the United States District Court for the Southern District of Florida in all suits or other actions (whether at law or in equity) which I may bring against the Company, the Manager or Affiliates of the Manager or which any of them may bring against me relating to the [LLC Agreement] and hereby waive my right to trial by jury in any such suit or action.

Id. Art. D(a) (emphasis added).
   The JV Agreement provides as follows::

> **Governing Law:  Venue.**  This Agreement shall be construed, enforced, and interpreted in accordance with the laws of the State of Florida (without regard to its conflicts of laws doctrines).  In the event of any dispute arising out of this Agreement, the parties hereto consent to the exclusive jurisdiction of any court of competent jurisdiction in Broward County, Florida.

JV Agr. Art. 3(e) (emphasis in original).

[6]  In describing the LLC Agreement, the CPO Memo states:

> The LLC Agreement, together with the provisions of the Florida Limited Liability Company Act, as amended, define the rights, obligations and preferences of the Members and the equity interests in The Pan American Fund, LLC represented by the Units . . . .  The LLC agreement is interpreted under the laws of Florida.  Each Member consents to the exclusive jurisdiction of the federal and state courts in Florida.

CPO Memo at 23 (emphasis added).

THIS BOOKLET UNLESS IT IS PRECEDED OR ACCOMPANIED BY THE [CPO MEMO].").

Plaintiffs, however, state that they do not recall receiving or signing any of these documents.  Aff. of Eli Bash Opp'n Defs.' Mot. ("Eli Aff.") ¶ 4, ECF No. 18–3; Aff. of Ruth Yovel-Bash Opp'n Defs.' Mot. ("Ruth Aff.") ¶¶ 2, 6, 14, ECF No. 18–2; Aff. of Yael Bash Opp'n Defs.' Mot. ("Yael Aff.") ¶ 3, ECF No. 18–4; Aff. of Amir Bash Opp'n Defs.' Mot. ("Amir Aff.") ¶ 3, ECF No. 18–5.

Defendants present no evidence that Ruth and Yael signed any of these agreements.  The only evidence defendants provide concerning whether any of the plaintiffs signed any written agreements is (a) three documents purportedly signed by Eli—a Subscription Agreement, LLC Agreement Signature Page, and Questionnaire; and (b) a JV Agreement purportedly signed by Amir.  Wood Aff. Ex. B.[7]

Accordingly, the Court assumes for purposes of this motion that Ruth and Yael did not sign any of these agreements, that Eli did not sign the JV Agreement, and that Amir did not sign the the Subscription Agreement or LLC Agreement.

Eli's purported signatures on the Subscription Agreement and LLC Agreement present a more complex question.  Eli flatly denies receiving documents from defendants besides promissory notes, though he fails to address the documentary evidence that he signed the Subscription Agreement and LLC Agreement. [8]  See Eli Aff. ¶ 4 ("[Eli and Ruth] kept a file over

---

[7]   None of these signatures is notarized, but the only agreement that requires notarization is the LLC Agreement.  See Eli LLC Agr. Signature Page; CPO Memo at 66.  Despite the CPO Memo's statement that the signature on the Subscription Agreement should be notarized, see CPO Memo at 66, neither the Subscription Agreement itself nor the Subscription Instructions in the Subscription Documents so require, see Subscription Agr. at 6; Subscription Documents.

[8]   In contrast, Eli does address the documentary evidence that he signed the Questionnaire, stating that while the signature "does appear to be mine[,] the handwriting is not and the answers thereon as to my income and assets . . .

the years and do not remember signing much at all.  We only received the Promissory Notes.").

Further, Eli's purported signature to the LLC Agreement should have been notarized but is not.

See Eli's LLC Agr. Signature Page; CPO Memo at 66.

Amir, in contrast, neither denies signing the JV Agreement nor addresses the documentary evidence that he did, stating only that "I do not remember receiving or speaking about the mass of documents produced by defendants in this motion.  I categorically deny that the 'investment strategy was explained to every investor in Pan American.'"  Amir Aff. ¶ 3.

### c.    Eli's Promissory Notes After 2006

On approximately January 3, 2008, Pan American "converted" Eli's investment to unsecured status.  See Wood Aff. ¶ 8; Jan. 3, 2008 Ltr. from Wood to Eli, Wood Aff. Ex. C.  On that approximate date, Pan American executed and delivered to Eli an unsecured promissory note, signed by Wood as Managing Member of Pan American, for Eli's investment of $150,000.  Eli's Jan. 3, 2008 Note, Eli's Notes.[9]  Pursuant to this note, Pan American promised to make monthly interest payments at an annual rate of ten percent until January 3, 2009.  Id.

Pan American executed and delivered similar unsecured notes to Eli on approximately March 24, 2011 and March 1, 2012.  See Eli's Mar. 24, 2011 Note, Eli's Notes; Eli's Mar. 1, 2012 Note, Eli's Notes.  These notes, like the subsequent notes Eli received, states that they are "governed by, construed and enforced according to the laws of the State of Florida."  Id.

Like the promissory notes Eli received before 2006, all of these unilateral promissory notes were drafted and signed in Florida.  See Eli's Notes.

---

are false."  Eli Aff. ¶ 5.  In any event, whether Eli signed the Questionnaire is irrelevant to this motion, for reasons including that the Questionnaire contains no forum-selection clause.

[9]    Although plaintiffs have not submitted a signed copy, moving defendants do not dispute the note's execution.  See Wood Aff. ¶ 8.

2.      **Ruth's Investments**

In approximately 2003, Ruth invested $100,000 through Mayer.  Compl. ¶ 15.  Plaintiffs

allege that Ruth began receiving promissory notes in 2003, though the earliest promissory note

the parties have provided the Court is dated September 10, 2007.  See id.; Ruth's Sept. 10, 2007

Note Benjamin Affm. Ex. 2 ("Ruth's Notes").  Ruth received yearly interest payments and

gradually increased her investment to $400,000.  Compl. ¶ 16.  Ruth wired her investment

monies from Israel to Florida.  Id. ¶ 42.

a.  *Ruth's Promissory Notes*

The following chart describes promissory notes Ruth received:

| Date | Maker | Signatory | Amount | Expiration | Securement | Choice of Law Provision |
|------|-------|-----------|--------|------------|------------|-------------------------|
| 9/10/07 | Pan American | Mayer, as Pan American's Managing Member | $330,000 | 9/9/08 | Pan American Units | No |
| 2/28/08 | Pan American | Wood, as Pan American's Manager | $430,000 | 2/28/09 | No | Yes |
| 2/26/10 | Pan American | Wood, as Pan American's Manager | $430,000 | 2/28/11 | No | Yes |
| 3/24/11 | Pan American | Wood, as Pan American's Manager | $400,000 | 2/28/12 | No | Yes |
| 3/1/12 | Pan American | Wood, as Pan American's Manager | $400,000 | 3/31/13 | No | Yes |

On approximately September 10, 2007, Pan American executed and delivered to Ruth a promissory note, which Mayer signed as Managing Member of Pan American, for Ruth's investment of $330,000.  Ruth's Sept. 10, 2007 Note, Ruth's Notes.  Pursuant to this note, Pan American promised to make monthly interest payments at an annual rate of ten percent until September 9, 2008.  Id.[10]

Defendants assert that Pan American "converted" Ruth's investment to unsecured status on approximately February 28, 2008.  See Wood Aff. ¶ 8.   On that date, before Ruth's September 10, 2007 Note expired, Pan American executed and delivered to Ruth an unsecured promissory note, which Wood signed as Manager of Pan American, for Ruth's increased investment of $430,000.  Ruth's Feb. 28, 2008 Note, Ruth's Notes.  Pursuant to this note, Pan American promised to make monthly interest payments at an annual rate of ten percent until February 28, 2009.  Id.  This note, like the later notes Ruth received, states that it "is governed by, construed and enforced according to the laws of the State of Florida."  Id.

Pan American executed and delivered a similar promissory note to Ruth on February 26, 2010.  See Ruth's Feb. 26, 2010 Note, Ruth's Notes.

On approximately March 24, 2011, Pan American executed and delivered to Ruth another unsecured promissory note, which Wood signed as Manager of Pan American, for Ruth's decreased investment of $400,000.  Ruth's Mar. 24, 2011 Note, Ruth's Notes.  Pursuant to this note, Pan American promised to make monthly interest payments at an annual rate of ten percent until February 28, 2012.  Id.

Pan American executed and delivered a similar promissory note to Ruth on March 1, 2012.  See Ruth's Mar. 1, 2012 Note, Ruth's Notes.

---

[10]    This note was secured by Pan American "units."  Ruth's Sept. 10, 2007 Note at 2.

All of these unilateral promissory notes were drafted and signed in Florida. See Ruth's Notes.

**3.     Yael's Investments**

In approximately February 2006, Yael invested $85,000 through Mayer by sending money from New York to Florida. Compl. ¶¶ 19, 42. Yael subsequently increased her investment until it reached $150,000. Id. ¶ 19.

*a.     Yael's Promissory Notes*

The following chart describes promissory notes Yael received:

| Date | Maker | Signatory | Amount | Expiration | Securement | Choice of Law Provision |
|------|-------|-----------|--------|-----------|------------|------------------------|
| 2/28/06 | Mabel Inc. | Mayer, as Manager | $85,000 | 2/28/07 | 6/19/05 note by Southern Investors Group LLC encumbering real estate | No |
| 3/12/07 | Bio Vita | Mayer and Wood, as Bio Vita's Manager | $15,600 | 3/12/08 | No | Yes |
| 10/1/07 | Pan American | Wood, as Pan American's Managing Member | $12,000 | 9/30/08 | No | No |
| 1/3/08 | Pan American | Wood, as Pan American's Managing Member | $137,000 | 1/3/09 | No | No |
| 1/8/08[11] | Pan American | Wood, as Pan American's Managing Member | $150,000 | 1/8/09 | No | No |
| 1/8/09 | Pan | Wood, as | $150,000 | 1/8/10 | No | Yes |

---

[11] The Court notes that plaintiffs' proposed amended complaint contains an allegation, irrelevant for purposes of this motion, that defendants post-dated this note to February 18, 2009. See Maizes Affm. ¶ 18.

|  | American | Pan American's Managing Member |  |  |  |  |
|---|---|---|---|---|---|---|
| 3/1/12 | Pan American | Wood, as Pan American's Manager | $150,000 | 3/31/13 | No | Yes |

On approximately February 28, 2006, Mabel Investments LLC Inc. ("Mabel Inc.," which may be the entity previously defined herein as Mabel and is not a defendant in this case), executed and delivered to Yael a promissory note, which Mayer appears to have signed electronically as Manager of Mabel, for Yael's investment of $85,000.  Yael's Feb. 28, 2006 Note, Benjamin Affm. Ex. 4 ("Yael's Notes").  Pursuant to this note, Mabel Inc. promised to make monthly interest payments at an annual rate of ten percent until February 28, 2007.  Id.[12]

On approximately March 12, 2007, Bio Vita Labs LLC Inc. ("Bio Vita"), which is not a defendant in this case but shared an address with Pan American, executed and delivered to Yael an unsecured promissory note, which both Wood and Mayer signed as Managers of Bio Vita, for Yael's additional investment of $15,600.  Yael's Mar. 12, 2007 Note, Yael's Notes.  Pursuant to this note, Bio Vita promised to make monthly interest payments at an annual rate of ten percent until March 12, 2008.  Id.  This note states that it "is governed by, construed and enforced according to the laws of the State of Florida."  Id.

On approximately October 1, 2007, Pan American executed and delivered to Yael an unsecured promissory note, which Wood signed as Managing Member of Pan American, for Yael's additional investment of $12,000.  Yael's Oct. 1, 2007 Note, Yael's Notes.  Pursuant to

---

[12]  This note was secured by a note dated June 19, 2005, issued "by Southern Investors Group LLC to the Maker for $3,200,000, which [securing note] is governed by . . . the laws of the State of Florida, encumbering . . . real estate."  Yael's Feb. 28, 2006 Note.

this note, Pan American promised to make monthly interest payments at an annual rate of ten percent until September 30, 2008.  Id.

Defendants assert that Pan American "converted" Yael's investment to unsecured status on approximately January 3, 2008.  Wood Aff. ¶ 8; Jan. 3, 2008 Ltr. from Wood to Yael, Wood Aff. Ex. C.  On approximately that date, Pan American executed and delivered to Yael an unsecured promissory note, which Wood signed as Managing Member of Pan American, for Yael's investment of $137,000.  Yael's Jan. 3, 2008 Note, Yael's Notes.  Pursuant to this note, Pan American promised to make monthly interest payments at an annual rate of ten percent until January 3, 2009.  Id.

Pan American executed and delivered similar promissory notes to Yael on approximately January 8, 2008, January 8, 2009, and March 1, 2012.  See Yael's Jan. 8, 2008 Note, Yael's Notes; Yael's Jan. 8, 2009 Note, Yael's Notes; Yael's Mar. 1, 2012 Note, Yael's Notes.[13]  Yael's January 8, 2009 and March 1, 2012 Notes are "governed by, construed and enforced according to the laws of the State of Florida."  Yael's Jan. 8, 2009 Note, Yael's Notes; Yael's Mar. 1, 2012 Note, Yael's Notes.

All of these unilateral promissory notes were drafted and signed in Florida.  See Yael's Notes.

Defendants have submitted documentation which suggests that Pan American may have provided Eli, Ruth, and Yael with federal tax forms listing each of these plaintiffs as "Partner[s]" of Pan American.  See Eli 2006 & 2008 K–1 Substitutes, Wood Aff. Ex. C; Ruth 2006 K–1 Substitute, Wood Aff. Ex. C; Yael 2006 & 2008 K–1 Substitutes, Wood Aff. Ex. C.

---

[13]   See Note 11, supra.

### 4.      Amir's Investment

In approximately 2004, Amir began investing with Pan American.  Compl. ¶ 18.  Amir "maintains" an investment of $200,000, with yearly interest payments of ten percent.  Id.

#### a.  Amir's JV Agreement

Amir does not recall ever receiving a promissory note from any of the defendants, and defendants provide no proof that he did.  Amir Aff. ¶ 3.  Yael tried, unsuccessfully, to contact defendants concerning promissory notes for Amir.  Id.

The only evidence defendants have provided the Court concerning a written agreement with Amir is the JV Agreement, dated August 1, 2006, between Amir and Pan American. Amir's Aug. 1, 2006 JV Agr., Wood Affm. Ex. B.  Pursuant to this JV Agreement, which is purportedly signed by Amir and a "Managing Member" of Pan American whose signature is illegible, Amir "accept[ed]" an allocation of "$200,000 of one or more loans in [Pan American's] loan portfolio," and Pan American agreed to make monthly interest payments to Amir at an annual rate of ten percent.  Id.

As described above, Amir neither denies signing the JV Agreement nor addresses the documentary evidence that he did, stating only that he "do[es] not remember receiving or speaking about the mass of documents produced by defendants in this motion.'"  Amir Aff. ¶ 3.

### B.      Subsequent Events

#### 1.      SEC Investigation

It appears from the documentation defendants have submitted that the SEC's Miami Regional Office investigated Pan American in approximately 2008–2010.  See SEC Investigation Exchange Documents, Wood Aff. Ex. D; Wood Aff. ¶ 18.  Contrarian handled the investigation on Pan American's behalf by hiring Florida counsel and producing over 18,000 pages, including

"all paperwork concerning [plaintiffs]." Id.  Contrarian now stores these documents at a facility in Florida.  Id.

On approximately February 17, 2010, the SEC informed Mayer that the SEC had completed investigating Pan American and did not intend to recommend any enforcement action against Pan American.  Feb. 17, 2010 Ltr. from Chedly C. Dumornay to Mayer, Wood Aff. Ex. E.

### 2.    The Instant Action

Plaintiffs commenced this action on October 22, 2012.  See Compl.

On June 20, 2013, defendants moved to dismiss or, in the alternative, transfer venue to the United States District Court for the Southern District of Florida, and plaintiffs cross-moved to amend the Complaint.  See Defs.' Mot.; Pls.' Cross-Mot.  **[ADD A SENTENCE IF MAYER JOINS IN DS' MOTION]**

## II.    DISCUSSION

### A.   Standard

#### 1.   Motion to Dismiss for Improper Venue

A party may move to dismiss on grounds of "improper venue."  Fed. R. Civ. P. 12(b)(3). To survive such a motion, the plaintiff must establish venue.  Zaltz v. JDate, No. 12–CV–3475, 2013 WL 3369073, at *2 (E.D.N.Y. July 8, 2013).  If the court relies only on pleadings and affidavits in deciding the motion, the plaintiff need only make a prima facie showing of venue. Id.  The court will accept as true the facts plaintiff alleges in the complaint and draw all reasonable inferences in the plaintiff's favor.  Id.  The court may also, in its discretion, consider facts outside the pleadings.  Id.

A valid and enforceable contractual forum-selection clause can constitute sufficient grounds for dismissal.  See id. at *3; TradeComet.com LLC v. Google, Inc., 647 F.3d 472, 478 (2d Cir. 2011).

In the context of a motion to dismiss, a forum-selection clause is presumptively enforceable if the moving party can demonstrate that (1) the clause was reasonably communicated to the party challenging enforcement; (2) the clause is mandatory rather than permissive; and (3) the claims involved are subject to the clause.  See Phillips v. Audio Active Ltd., 494 F.3d 378, 383 (2d Cir. 2007).  The court must view the facts in the light most favorable to the party that "seek[s] to avoid enforcement of such a contractual clause."  New Moon Shipping Co., Ltd. v. Man B & W Diesel AG, 121 F.3d 24, 29 (2d Cir. 1997).  Moreover, where the parties have a factual dispute concerning the clause, the disputed fact "may be resolved in a manner adverse to the plaintiff [opposing enforcement] only after an evidentiary hearing."  Id.

If the moving party meets its burden, the burden shifts to the party opposing dismissal to make a "sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'"  Phillips, 494 F.3d at 384 (quoting M/S Bremen v. Zapata Off–Shore Co., 407 U.S. 1, 15 (1972)).  A forum-selection clause is unreasonable if (1) its incorporation into the agreement resulted from fraud or overreaching; (2) the complainant will be deprived of her day in court due to the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) the clause contravenes a strong public policy of the forum state.  Zaltz, 2013 WL 3369073, at *8.  Whether the party opposing dismissal has rebutted the presumption of enforceability is a question of federal law.  Id., at *3.[14]

---

[14]   The Court does not address the parties' arguments concerning whether it has personal jurisdiction over defendants.  The issue is irrelevant because the Court is transferring venue for other reasons.

### 2.  Motion to Transfer Venue

Even if the court finds grounds to dismiss for improper venue, the court has discretion to transfer venue instead, "if it be in the interest of justice, [to] . . . any district or division in which [the case] could have been brought."  28 U.S.C. § 1406(a); see S & L Birchwood, LLC v. LFC Capital, Inc., 752 F. Supp. 2d 280, 283 (E.D.N.Y. 2010); Ohuche v. Allstate Prop. & Casualty Ins. Co., No. 11–CV–4905, 12 WL 2900530, at *2 (S.D.N.Y. July 12, 2012) (denying motion to dismiss for improper venue on basis of forum-selection clause, where plaintiff was "not a sophisticated corporation, but rather an individual who claims that she was never informed of" forum-selection clause, yet granting alternative motion to transfer venue).

Similarly, the court may transfer a properly venued case "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any district or division in which it could have been brought."  28 U.S.C. § 1404(a); see Zaltz, 2013 WL 3369073, at *3.  This statute's purpose "is to prevent waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense."  Schwartz v. Marriott Hotel Servs., Inc., 186 F. Supp. 2d 245, 248 (E.D.N.Y. 2002) (internal quotation marks omitted).

Defendants cite Section 1404(a), but not Section 1406(a), in moving to transfer venue.  However, because defendants argue that venue is improper, I also construe their motion pursuant to Section 1406(a).  See S & L Birchwood, 752 F. Supp. 2d at 284 ("Whether considered under Section 1404 or 1406, the burden is on the party seeking transfer, and the court considers the same factors when determining whether to exercise the discretion to transfer.").

The party who seeks to transfer venue must make a threshold showing that the plaintiff could have brought the case initially in the proposed transferee forum.  Merkur v. Wyndham Int'l, Inc., No. 00–CV–5843, 2001 WL 477268, at *1 (E.D.N.Y. Mar. 30, 2001).  Next, the movant must show that transfer would promote the convenience of the parties and witnesses and

the interest of justice.  Id. (citing 28 U.S.C. § 1404(a); Baker v. Bennett, 942 F. Supp. 171, 175–

76 (S.D.N.Y. 1996)).  Among the factors the court should consider in making this determination

are:  (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the locus of

operative facts; (4) the availability of process to compel the attendance of unwilling witnesses;

(5) the location of relevant documents and the relative ease of access to sources of proof; (6) the

relative means of the parties; (7) the district court's familiarity with governing law; (8) the

weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interest of justice.

Schwartz, 186 F. Supp. 2d at 248; see also New York Marine & Gen. Ins. Co. v. Lafarge North

America, Inc., 599 F.3d 102, 112 (2d Cir. 2010).  No one factor is dispositive.  Schwartz, 186 F.

Supp. 2d at 248.

On a motion to transfer venue, unlike on a motion to dismiss, a forum-selection clause is

"merely one factor—albeit, a significant one."  Zaltz, 2013 WL 3369073, at *9; see Stewart

Org., Inc. v. Ricoh Corp., 487 U.S. 22, 31 (1988) ("The forum-selection clause . . . should

receive neither dispositive consideration . . . nor no consideration . . . but rather the consideration

for which Congress provided in § 1404(a)."); Indian Harbor Ins. Co. v. NL Env. Mgmt. Servs.,

Inc., No. 12–CV–2045, 13 WL 1144800, at *4 (S.D.N.Y. Mar. 19, 2013) ("On a motion to

transfer, courts consider a forum selection clause in connection with the convenience/interest of

justice prong of the Section 1404(a) test.").

If the party seeking a venue transfer produces clear and convincing evidence that the

balance of factors favors transfer, the court has discretion to grant the motion.  See New York

Marine & Gen. Ins. Co., 599 F.3d at 113; see also Merkur, 2001 WL 477268, at *2 (stating that

movant bears burden of making "clear-cut showing" that transfer is in the litigation's best

interest).  The movant "must support the application with an affidavit containing detailed factual

statements relevant to the factors the Court considers when deciding a motion to transfer venue." Schwartz , 186 F. Supp. 2d at 248 (citations omitted).  "[M]otions to transfer are within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis."  In re Cuyahoga Equip. Corp., 980 F.2d 110, 117 (2d Cir. 1992).

**B.**   **Analysis**

    **1.**   **Motion to Dismiss for Improper Venue**

        *a.   The Contractual Forum-Selection Clauses*

As described above, defendants present documentary evidence that Eli may have signed the Subscription Agreement and LLC Agreement, and that Amir may have signed the JV Agreement, all of which contain forum-selection clauses.  See Part I(A)(1), supra.

Construing the evidence in the light most favorable to plaintiffs, the parties' submissions reflect that a factual dispute exists concerning whether Eli signed the Subscription Agreement and LLC Agreement.  Although Eli does not directly address the documentary evidence that he signed these agreements or assert that his purported signatures are forgeries, he maintains that the only documents he received from defendants were promissory notes.  See Eli Aff. ¶ 4.  Eli's unqualified assertion that he received only promissory notes calls into question whether the purported signatures on the Subscription Agreement and LLC Agreement are actually his. Accordingly, before the Court could resolve this factual question against Eli, the Court would need to conduct an evidentiary hearing.  See New Moon Shipping Co., 121 F.3d at 29.

In contrast, even construing the evidence in the light most favorable to plaintiffs, the parties' submissions reflect that no genuine factual dispute exists concerning whether Amir signed the JV Agreement.  As described above, Amir does not deny signing the JV Agreement or assert that his purported signature is a forgery; he asserts only that he "do[es] not remember

receiving or speaking about the mass of documents produced by defendants in this motion." Amir Aff. ¶ 3 (emphasis added).  This assertion does not call into question (or rebut the presumption) that the signature on the JV Agreement is Amir's.  Accordingly, the Court could resolve the question of whether Amir signed the JV Agreement without holding an evidentiary hearing.  See Zaltz, 2013 WL 3369073, at *3 n.5 ("Plaintiff has submitted no evidence to controvert defendant's evidence on this issue . . ., and thus no evidentiary hearing is warranted.").

Regardless of which agreements Eli and Amir signed, the Court would deny the motion to dismiss and grant the motion to transfer venue because there is no evidence that Ruth and Yael agreed to any forum-selection clause, and factors unrelated to the forum-selection clauses weigh overwhelmingly in favor of transferring venue.  See 28 U.S.C. § 1406(a); Paul v. Shinseki, No. 09–CV–1591, 2010 WL 3927077, at *6 (E.D.N.Y. Sept. 19, 2010) (transferring venue instead of dismissing because "transfer is in the interest of justice"); S & L Birchwood, 752 F. Supp. 2d at 283; Ohuche, 2012 WL 2900530, at *2; Part II(B)(2), infra.

For these reasons, the Court need not conduct a hearing to determine which agreements Eli signed, and the motion to dismiss for improper venue is denied.

    **2.**    **Motion to Transfer Venue**

        ***a.  Plaintiffs Could Have Brought This Action in the Southern District of Florida***

Federal question jurisdiction exists, pursuant to 28 U.S.C. § 1331, because plaintiffs allege that defendants violated the RICO statute, 18 U.S.C. § 1962(b)–(d).  Diversity jurisdiction also exists, pursuant to 28 U.S.C. § 1332, because plaintiffs are citizens of New York, defendants are citizens of Florida, and the amount in controversy exceeds $75,000.

Venue in the Southern District of Florida would be proper for two independent reasons—defendants reside there, and most of the acts or omissions giving rise to the Complaint occurred there. See 28 U.S.C. § 1391(b)(1)–(2).

Accordingly, plaintiffs could have brought this action in the Southern District of Florida.

### b. *Other Discretionary Factors Overwhelmingly Warrant Transfer*

#### i.  Convenience of the Witnesses

"Convenience of the witnesses generally is the most important consideration when deciding a motion to transfer venue . . . ." Schwartz , 186 F. Supp. 2d at 249.  The movant must identify clearly the key witnesses and their expected testimony.  See Orb Factory, Ltd. v. Design Sci. Toys, Ltd., 6 F. Supp. 2d 203, 208–09 (S.D.N.Y. 1998); Audiovox Corp. v. S. China Enter., Inc., No. 11–CV–5142, 2012 WL 3061518, at *7 (E.D.N.Y. July 26, 2012).  "[I]t is not the number of prospective witnesses that determines the appropriateness of a transfer but, rather, the materiality of their anticipated testimony."  Merkur, 2001 WL 477268, at *3.

Here, defendants argue that all of their witnesses are in Florida, including defendants, the SEC official who investigated Pan American, the lawyers who drafted the relevant documents and represented Pan American during the SEC investigation, Pan American's employees, and other, unidentified investors who declined to sue Pan American because they knew doing so would be baseless.

The Court credits defendants' assertion that defendants, Pan American employees, and the Florida-based SEC investigator will provide material testimony.  It also seems plausible that the lawyers who drafted the relevant documents and represented Pan American in the SEC investigation could provide material testimony concerning defendants' negotiations with plaintiffs and the SEC.  In contrast, the Court discredits defendants' assertion that non-party

investors in Pan American will provide material testimony; defendants neither identify these individuals nor explain why their testimony would be relevant.

The only witnesses plaintiffs identify are themselves.

Because defendants' material witnesses outnumber plaintiffs, the overall convenience of the witnesses weighs heavily in favor of transferring venue to the Southern District of Florida.

### ii.  Convenience of the Parties

If the Court grants the motion, the four plaintiffs and their lawyer will need to travel from New York to Florida.  If the Court denies the motion, the three individual defendants and their lawyers will need to travel from Florida to New York.

Accordingly, this factor weighs slightly against transfer.

### iii.  Locus of Operative Facts

"Courts routinely transfer cases when the principal events occurred and the principal witnesses are located in another district." In re Nematron Corp. Secs. Litig., 30 F. Supp. 2d 397, 404 (S.D.N.Y. 1998); see also Viacom Int'l, Inc. v. Melvin Simon Prods., 774 F. Supp. 858, 867 (S.D.N.Y. 1991) (same).

Plaintiffs argue that Mayer solicited Ruth's investment in New York, Eli signed the Questionnaire in New York, and plaintiffs wired money from New York.  The majority of the relevant events, however, occurred in Florida.  Pan American and Contrarian operated their offices in Florida, where defendants allegedly received plaintiffs' money, executed the promissory notes, breached their agreements with plaintiffs, headquartered and operated a Ponzi scheme, converted plaintiffs' investments, and were unjustly enriched.  Also, the SEC investigated Pan American, and made its determination concerning Pan American, in Florida. Therefore, the vast majority of events relevant to defendants' alleged wrongful conduct occurred in Florida and, as between Florida and New York, Florida is the locus of operative facts.

23

Accordingly, this factor weighs heavily in favor of transfer.

          iv.   Availability of Process to Compel Unwilling Witnesses

A subpoena may be served "outside [the] district but within 100 miles of the place specified for the deposition, hearing, trial, production, or inspection.  Fed R. Civ. P. 45(b)(2). Where the movant fails to present evidence that its witnesses would be unwilling to testify, a court's ability to compel witnesses to attend is not a factor in the transfer-of-venue analysis.  See Brozoski v. Pfizer, Inc., No. 00–CV–4215, 2001 WL 618981, at *4 (S.D.N.Y. June 6, 2001) (citing Soto v. Bey Transp. Co., Nos. 95–CV–9329, 97–CV–1446, 96–CV–3142, 97–CV–1177, 1997 WL 407247 (S.D.N.Y. July 21, 1997)).

Neither defendants nor plaintiffs argue that their witnesses would be unwilling to testify.

This factor is, therefore, irrelevant to deciding the motion.

          v.   Location of Relevant Documents and Relative Ease of Access to Sources of Proof

Under this factor, courts assess which forum would be more conducive to accessing evidentiary objects, such as documents.  Given modern technological capacity for transmitting documents, this factor has become less important.  See Aerotel Ltd. v. Sprint Corp., 100 F. Supp. 2d 189, 197 n.9 (S.D.N.Y. 2000) (citation omitted).  To present facts that would make this factor relevant, the moving party must explain the nature, extent, volume, or relevance of the documents in question.  See Pall Corp. v. PTI Technologies, Inc., 992 F. Supp. 196, 200 (E.D.N.Y. 1998).

Defendants argue that over 18,000 pages Pan American produced to the SEC, including "all paperwork concerning [plaintiffs]," are at a storage facility in Florida.  Wood Aff. ¶ 18.  But defendants neither estimate how many of these pages are relevant to this action nor argue that producing the pages electronically would be unduly burdensome.

Accordingly, this factor weighs only slightly in favor of transfer.

### vi. Relative Means of the Parties

A court may consider the parties' relative financial means if a disparity exists between them, such as when an individual sues a corporation. See Nematron Corp. Secs. Litig., 30 F. Supp. 2d at 405. Any party that claims financial hardship must provide supporting evidence. See Seltzer v. Omni Hotels, No. 09–CV–9115, 2010 WL 3910597, at *5 (S.D.N.Y. Sept. 30, 2010).

Here, plaintiffs and defendants argue that litigating outside their preferred fora would be inconvenient. Plaintiffs also argue that defendants can afford to travel to New York because defendants have plaintiffs' "life savings."

However, no party presents any documentation to support a claim of relative financial hardship. See Schwartz, 186 F. Supp. 2d at 248.

Accordingly, this factor is irrelevant to the instant motion.

### vii. District Court's Familiarity with Governing Law

A "forum's familiarity with the governing law . . . is one of the least important factors in determining a motion to transfer, especially where no complex questions of foreign law are involved." JFP Touring, LLC v. Polk Theatre, Inc., No. 07–CV–3341, 2007 WL 2040585, at *15 (S.D.N.Y July 12, 2007).

In their Complaint, plaintiffs assert causes of action under the federal RICO statute, New York General Business Law, and common law.

This Court and courts in the Southern District of Florida are eminently capable of adjudicating the federal RICO claims.

This Court is better situated to adjudicate the New York statutory claim, though courts in the Southern District of Florida have handled claims under N.Y. Gen. Bus. L. § 349 before, and defendants do not argue that this case presents any complex or novel issues under that statute.

The Southern District of Florida, however, is better situated to adjudicate plaintiffs' claims that involve interpreting or enforcing the promissory notes—specifically, the breach of contract claims, the unjust enrichment claims (which are quasi-contract claims), and the claim that the promissory notes reflect defendants' downgrading plaintiffs' investments from secured to unsecured.

If the case remained in this Court, the Court would apply Florida law to these claims. Pursuant to New York choice-of-law principles, courts in this Circuit utilize a "center of gravity" test (also called a "significant relation" or "grouping of contacts" test) to determine the law governing a contract. Sabella v. Scantek Medical, Inc., No. 08–CV–453, 2009 WL 3233703, at *12 (S.D.N.Y. Sept. 25, 2009) (internal quotation marks omitted). Under this test, the court applies the law of the state that has the most significant relationship to the transaction and the parties, considering (1) the place of contracting, (2) the place of contract negotiation, (3) the place of performance, (4) the location of the contract's subject matter, and (5) the contracting parties' domicile. Id. Florida has the most significant contacts with the transaction because defendants drafted, executed, and, at least for a time, performed under the notes while domiciled there.

Also, several of the promissory notes contain a choice-of-law provision that the note "is governed by, construed and enforced according to the laws of the State of Florida." Eli's Mar. 24, 2011 Note; Eli's Mar. 1, 2012 Note; Ruth's Feb. 28, 2008 Note; Ruth's Feb. 26, 2010 Note; Ruth's Mar. 24, 2011 Note; Yael's Mar. 12, 2007 Note; Yael's Jan. 8, 2009 Note; Yael's Mar. 1,

2012 Note.  New York choice-of-law rules are "unambiguous in the area of express choice of law provisions in a contract . . . . Absent fraud or violation of public policy, contractual selection of governing law is generally determinative *so long as the State selected has sufficient contacts with the transaction*."  Sabella, 2009 WL 3233703, at *12 (internal quotation marks omitted) (emphasis in original); see MK Systs., Inc. v. Schmidt, No. 04–CV–8106, 2005 WL 590665, at *5 (S.D.N.Y. Mar. 10, 2005) (finding that Northern District of Georgia's greater familiarity with Georgia law governing case, pursuant to contractual choice-of-law provision, favored transfer).

While Eli, Ruth, and Yael argue that they did not sign the unilateral promissory notes, they received the notes without objecting to the choice-of-law provision and benefited under the notes while defendants made payments thereunder.  Moreover, plaintiffs cite no legal authority as to why New York law should govern these claims.  Accordingly, the Court would apply Florida law to these claims.

As for plaintiffs' conversion and fraudulent inducement/concealment claims, it is not immediately obvious to the Court which law should apply.  Under New York's choice-of-law rules, courts in this District apply an "interest analysis" to tort claims, pursuant to which "the law of the jurisdiction having the greatest interest in the litigation will be applied."  White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006) (internal quotation marks omitted).  Here, New York's interest is that plaintiffs allege they suffered injury in New York.  Florida's interest is that defendants allegedly operated a fraudulent scheme in Florida that has already attracted an SEC investigation and at least one other lawsuit in the Southern District of Florida by someone plaintiffs concede is a "New York investor."  Pls.' Mem. of L. Opp'n Defs.' Mot. at 14, ECF No. 18.

On balance, the courts in both venues seem relatively equally well-poised to adjudicate plaintiffs' claims.  If this Court presided, the Court would need to apply at least some Florida law to plaintiffs' contract and quasi-contract claims (and possibly to plaintiffs' tort claims).  If a court in the Southern District of Florida presided, that court would need to apply a straightforward provision of New York's General Business Law (and possibly New York law to plaintiffs' tort claims).

Accordingly, the Court considers this factor neutral.

viii.   Weight Accorded to Plaintiff's Choice of Forum

Courts generally should not disturb a plaintiff's choice of forum unless other factors weigh strongly in favor of transferring venue.  See Nematron Corp. Secs. Litig., 30 F. Supp. 2d at 405; Berman v. Informix Corp., 30 F. Supp. 2d 653, 656 (S.D.N.Y. 1998) ("[I]n considering the motion for transfer, a court should not disturb a plaintiff's choice of forum unless the defendants make a clear and convincing showing that the balance of convenience favors defendants' choice.") (internal quotation marks omitted); see also Merkur, 2001 WL 477268, at *3.  However, a plaintiff's choice of forum "will be accorded less weight where the plaintiff's chosen forum is neither [his] home nor the place where the operative factors of the action occurred," Merkur, 2001 WL 477268, at *3, or where "there exists a valid and enforceable forum selection clause," Zaltz, 2013 WL 3369073, at *16.

Here, defendants make a clear and convincing showing that Florida is the primary locus of operative facts and would, on balance, be more convenient for the material witnesses.

These factors overcome the deference the Court would otherwise afford plaintiffs' wish to proceed in this District.

ix.   Trial Efficiency and Interest of Justice

28

Because the Court has not devoted significant time or resources to this case, this District and the Southern District of Florida are equally appropriate venues to resolve the case efficiently. Further, requiring the parties to litigate all of the claims in one forum promotes efficiency by streamlining discovery, motion practice, and trial, and is "consistent with accepted practice." <u>Paul</u>, 2010 WL 3927077, at *6. Somehow splitting plaintiffs' claims between two fora would be inefficient.

Further, the Court sees no way in which maintaining venue here would better serve the interest of justice.

Accordingly, this factor is neutral.

In sum, the balance of the relevant factors weighs overwhelmingly in favor of transferring venue to the Southern District of Florida. As discussed above, the material witnesses would, overall, find Florida more convenient. As between Florida and New York, Florida is the locus of operative facts. These considerations overcome the deference I would otherwise afford plaintiffs' choice of forum, particularly because this District and the Southern District of Florida are equally poised to serve the interests of efficiency and justice.

### III.    CONCLUSION

For the foregoing reasons, defendants' motion to transfer venue to the Southern District of Florida is granted.  Accordingly, I do not reach defendants' motion to dismiss for failure to state a claim or plaintiff's cross-motion to amend the Complaint, which are more properly venued in the Southern District of Florida.


SO ORDERED.

Dated:  September 5, 2013
Brooklyn, New York


                              _____/s/_____
                              JOAN M. AZRACK
                              UNITED STATES MAGISTRATE JUDGE